Affirmed and Opinion filed August 16,
2011.

 

In
The

Fourteenth
Court of Appeals



NO. 14-10-00558-CV



Forest Oil
Corporation, Appellant 

v.

Eagle Rock
Field Services, LP, Appellee 



On Appeal from
the 234th District Court

Harris County, Texas

Trial Court
Cause No. 2007-16130



 

OPINION 

            Forest
Oil Corporation appeals the trial court’s take-nothing judgment in favor of
Eagle Rock Field Services, LP, on Forest Oil’s breach-of-contract and waste
claims arising out of a gas-purchase agreement.  In four issues, Forest
contends the trial court erred by granting Eagle Rock’s motion for summary
judgment and denying Forest’s motion for partial summary judgment, concluding
that Eagle Rock did not commit waste, and overruling Forest’s objection to the
admission of extrinsic evidence of the contracting parties’ intent when construing
an unambiguous agreement.  For the reasons explained below, we affirm.

I

            Forest
and Eagle Rock are successors to a gas-purchase agreement originally executed
by Peak Operating of Texas, LLC, and ONEOK Texas Fields Services, L.P., on
October 1, 2003.  Under the agreement, Forest (Peak’s successor) agreed to sell
gas produced from wells on specified lands and leases in Texas to Eagle Rock
(ONEOK’s successor).  In 2003, the agreement was amended to cover additional
lands and leases and to amend the payment terms.  As amended, the agreement
entitled Forest to receive compensation for eighty-five percent of the natural-gas
liquids (“NGLs”) and residue gas up to a certain quantity, and ninety-two
percent of the NGLs and residue gas exceeding that quantity.  The agreement
terminated according to its terms on September 30, 2008.  

            In
2007, Forest sued Eagle Rock for breach of contract, breach of duty, waste, and
confusion of goods.  Forest contended that Eagle Rock breached the agreement by
failing to pay to Forest the value associated with liquids that condensed
within Eagle Rock’s compression facilities and within Eagle Rock’s Arrington
Plant where the gas was processed and sold.  Forest’s primary complaint was
that, under the terms of the agreement, Eagle Rock’s compression of Forest’s
gas through “mechanically induced changes in pressures and temperatures”
constituted “processing”—a term not defined in the agreement—resulting in the
recovery of NGLs for which Forest should be compensated.  Forest also alleged
that Eagle Rock wrongfully allowed significant volumes of NGLs to evaporate
from its compression facilities in breach of its common-law duty to perform its
contractual obligations with skill and care and in a good and workmanlike
manner.  

            In
November 2008, Eagle Rock moved for summary judgment, asserting that the agreement’s
unambiguous language precluded all of Forest’s claims.  Forest responded and
argued, among other things, that Eagle Rock misconstrued the agreement and
ignored controlling, defined terms that supported Forest’s interpretation of
the agreement.  The trial court denied Eagle Rock’s motion, concluding at the
time that as both Eagle Rock and Forest had presented ostensibly reasonable interpretations
of the agreement, the agreement was ambiguous.  

            In
October 2009, after conducting further discovery, Eagle Rock again moved for
summary judgment on all of Forest’s claims.  In response, Forest moved for
partial summary judgment against Eagle Rock.  The trial court declined to rule
on these motions, and the parties proceeded to a non-jury trial.  Over three
days, the parties presented various witnesses (both live and by deposition),
including corporate representatives, experts, and the individuals who
originally negotiated the agreement on behalf of Peak and ONEOK.[1]  At the
trial’s conclusion, the trial court asked the parties to submit post-trial briefing
summarizing their closing arguments and instructing them to specifically address
the liability and damages theories.  Forest and Eagle Rock complied.  

            On
May 20, 2010, the trial court entered a take-nothing judgment in favor of Eagle
Rock.  The trial court also filed extensive findings of fact and conclusions of
law in which it explained that, upon further examination, it concluded that the
agreement and the term “processing” were unambiguous, and granted Eagle Rock’s
November 2008 motion for summary judgment.  Alternatively, the court determined
that even if the agreement were ambiguous, Forest’s claims still failed as a
matter of fact and by virtue of applicable case law.  This appeal followed.

II

            On
appeal, Forest asserts that the “clear language” of the agreement dictates that
hydrocarbon liquids extracted and recovered from Forest’s gas stream from
compression involving mechanically induced, significant pressure increases and
temperature changes are the result of “processing” within the plain, ordinary
use of the word, as well as within the context of oil and gas industry custom
and usage.  As a matter of law, Forest contends, these liquids are contractual
NGLs for which Forest is entitled to compensation under the agreement.

            Eagle
Rock responds that the agreement unambiguously requires Forest to maintain
delivery pressures sufficient to enter Eagle Rock’s gathering system and to
refrain from processing the gas before delivering it to Eagle Rock.  Eagle Rock
contends that, because the parties contemplated that Forest may be required to
compress its gas before delivery to maintain the agreed delivery pressure, its
use of compression could not be considered “processing” under the unambiguous
terms of the agreement, because only Eagle Rock was permitted to perform
processing.  And, even if the agreement is ambiguous, the evidence adduced at
trial, including the intentions of the contracting parties, supports the
judgment.[2] 
Further, because Forest’s waste claim is derivative of its contract claim, it
too must fail.  

            For
the reasons explained below, we conclude that the trial court correctly
determined that, as a matter of law, the term “processing” as applied to the agreement
does not include compression.  Therefore, the trial court did not err in
granting Eagle Rock’s November 2008 motion for summary judgment. 

A

            In
a traditional motion for summary judgment, the movant has the burden to show
there is no genuine issue of material fact and it is entitled to judgment as a
matter of law. Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548 (Tex.1985).
 In determining whether there is a genuine fact issue precluding summary
judgment, evidence favorable to the non-movant is taken as true and the
reviewing court makes all reasonable inferences and resolves all doubts in the
non-movant’s favor.  Id. at 548–49.
 If there is no genuine issue of material fact, summary judgment should issue
as a matter of law.  Haase v. Glazner, 62 S.W.3d 795, 797 (Tex. 2001).
 We review a trial court’s summary judgment de novo.  Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005).

            In
construing a written contract, the
primary concern of the court is to ascertain the true intentions of the parties
as expressed in the instrument.  Seagull Energy E & P, Inc. v. Eland
Energy, Inc.,
207 S.W.3d 342, 345 (Tex. 2006).  We presume the
parties to the contract intended every clause to have some effect.  Heritage
Res., Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996).  Contract terms
are given their plain, ordinary, and generally accepted meanings unless the
contract itself shows them to be used in a technical or different sense.  Valence
Operating Co., 164 S.W.3d at 662.  We construe contracts from a utilitarian standpoint, bearing in mind the
particular business activity sought to be served.  Frost Nat’l Bank v. L
& F Distribs., Ltd., 165 S.W.3d 310, 312 (Tex. 2005).  We will avoid,
when possible and proper, a construction which is unreasonable, inequitable,
and oppressive.  Id.

            Whether
a contract is ambiguous is a question of law.  J.M. Davidson, Inc. v.
Webster, 128 S.W.3d 223, 229 (Tex. 2003).  A contract is ambiguous when its
meaning is uncertain and doubtful or reasonably susceptible to more than one
interpretation.  Heritage Res., Inc., 939 S.W.2d at 121.  A contract is
not ambiguous simply because the parties advance conflicting interpretations.  Columbia
Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex. 1996).
 We determine whether a contract is ambiguous by looking to the contract as a
whole in light of the circumstances present when the parties executed it.  Sun Oil Co. (Del.) v. Madeley, 626 S.W.2d 726, 731 (Tex. 1981).
 If a contract is not ambiguous, courts must enforce it as written without
considering parol evidence for the purpose of creating an ambiguity or giving
the contract “a meaning different from that which its language imports.”  David J. Sacks, P.C. v. Haden, 266 S.W.3d 447, 450 (Tex. 2008)
(per curiam).  The contract is not ambiguous if it can be given a certain or
definite meaning as a matter of law.  Universal Health Servs., Inc. v.
Renaissance Women’s Group, P.A., 121 S.W.3d 742, 746 (Tex. 2003).  

B

1

            To
place the terms of the agreement in context, we draw the following background
facts from the summary-judgment record and the trial court’s unchallenged
findings of fact.  Under the agreement, Forest agreed to sell and Eagle Rock
agreed to buy and process natural gas produced from lands or leases owned by
Forest in the Texas Panhandle.  Forest delivered its gas from numerous wells to
two receipt points known as the Peak-Johnson (or Peak) and Finsterwald central
delivery points (the “CDPs”).  Forest did not compress the gas before
delivering it to Eagle Rock.  After reaching the CDPs, Forest’s gas entered
Eagle Rock’s gathering system and was transported to the Mesa Compressor
Station.  Here, compression was used to lower the pressure at the inlet of
Eagle Rock’s gathering system so that greater volumes of gas could enter the
system from Forest’s wells.

            Before
the gas stream could be compressed, it was necessary to remove hydrocarbon liquids
(and water) from the gas to avoid damaging the compression equipment.  At the
Mesa Compressor Station, the gas first passed through an inlet separator, where
liquid hydrocarbons condensed and were separated from gaseous elements
principally by gravity, with the heavier liquids falling to the bottom of the
separator and the gas rising to the top.  The liquids were removed and
transferred to storage tanks.[3] 
The gas then passed through multiple stages of compression involving mechanical
compressors and cooling fans, which raised the pressure and changed the
temperature of the gas.  Additional separators were used to remove from the gas
stream any additional liquids that formed as a consequence of compression.[4]  The
liquids recovered were transferred to the storage tanks.  

            After
passing through the Mesa Compressor Station, the gas was then transported via
pipeline several miles to a fenced-in area identified generally as Eagle Rock’s
“Arrington Plant.”  The fenced-in area contained additional compression
facilities and separators where Eagle Rock recovered additional liquids from
the gas and stored it in tanks.  After the gas was compressed to a sufficient pressure,
the compressed gas entered Eagle Rock’s lean-oil facility within the Arrington
Plant.  At this point, the gas still contained many liquids present in the
gaseous phase that remained in the gaseous phase upon delivery to the lean-oil
facility.  At the lean-oil facility, the liquids remaining in the gas stream
were extracted through refrigerated lean-oil processing, in which lean oil
bonds with the entrained liquids to remove them from the gaseous phase and
convert them to the liquid phase.  The NGLs this process yielded were removed
and discharged into a pipeline at the tailgate of the plant for sale.  

Both
Forest and Eagle Rock agree that all liquids the lean-oil process extracted are
the product of “processing” and are contractual NGLs for which Forest is
entitled to payment.  Forest makes no claim that it was not properly paid for
the liquids extracted through the lean-oil recovery process at the Arrington
Plant.  

2

            Under
the agreement, Forest agreed to contract exclusively with Eagle Rock “for the
purchase of [Forest’s] Gas[5]
and the right to process and extract Natural Gas Liquids attributable to
[Forest’s] Gas” from wells on specified lands and leases.  “Natural Gas
Liquids” or “NGLs” are defined in the agreement as “those liquid hydrocarbons
extracted from the Gas from processing.”[6] 
But “processing,”—the term central to this dispute—is not defined, even though
the words “process,” “processed,” and “processing” are used throughout the
agreement.  Therefore, reviewing the agreement as a whole in light of the
circumstances present when the parties executed it, we must determine whether
the meaning of “processing” may be determined as a matter of law.

            Under
section 4.1.3 of the agreement, Forest reserved the right to “retain all
liquids and Condensate separated from the Gas by the use of typical volumetric
(non-refrigerated) oil and Gas separators prior to the delivery of the Gas to
[Eagle Rock] at the specified “Receipt Point(s).”[7] 
“Condensate” is defined as “the liquid hydrocarbons that are recovered from the
Gas in typical oil and Gas separators or pipeline drips, usually from changes
in ambient or ground temperature and/or pressure, but not from processing.”[8]  Thus,
Forest was entitled to retain liquid hydrocarbons constituting condensate
recovered from its own separators before delivery to Eagle Rock, but not liquid
hydrocarbons removed through processing.  

            Further,
in section 4.2.1 of the agreement, Forest specifically agreed to “grant,
assign, and convey to [Eagle Rock] exclusive processing rights for the recovery
of Plant Products for Gas delivered to [Eagle Rock] for processing at the
Receipt Points.”  “Plant(s)” were defined as “Gas processing facilities where Natural
Gas Liquids and other Plant Products are separated from the Gas.”  “Plant
Products” were defined as “the Natural Gas Liquids and helium, if any, as
extracted from processing.”  Accordingly, the parties contemplated that NGLs
would include only those liquid hydrocarbons separated or extracted from the gas
through processing, and only Eagle Rock had the right to process the gas. 
Consistent with this understanding, Forest also expressly agreed that it “shall
not process the Gas or allow the Gas to be processed” before delivery to Eagle
Rock for processing.  

            Under
the agreement, Forest was entitled to receive compensation for eighty-five
percent of the NGLs “saved and sold at the Plant(s)”[9] and “Residue
Gas” “sold at the tailgate of [Eagle Rock’s] Plant(s),” up to a total
monthly MCF of 185,000.[10]
 If Forest delivered total monthly volumes in excess of 185,000 MCF, then Forest
was entitled to receive compensation for ninety-two percent of the NGLs and
residue gas.  However, under Section 4.2.2 of the gas purchase agreement,
“Condensate” recovered by Eagle Rock “downstream of the Receipt Point(s)”
belonged to Eagle Rock.  This section provided that “[t]itle to the Condensate
shall pass to [Eagle Rock] upon its recovery by [Eagle Rock] and shall be free
and clear of all liens, claims, and encumbrances created by, through or under
[Forest].”  The central issue in this case, therefore, is whether the liquids
at issue are NGLs for which Forest is entitled to compensation.




Significantly,
the agreement also contained certain requirements for delivery, compression,
and pressures.  The relevant sections are as follows:

3.4.1.  Transitional Contract Volume.

            (a)       Initial Deliveries and Pressures. 
Commencing with the effective date of the Agreement (“Effective Date”),
[Forest] may deliver up to 3,000 Mcf/d at the Receipt Point specified in the
Agreement at pressures sufficient to enter [Eagle Rock’s] system.  [Eagle Rock]
estimates the line pressure to range between 95-150 psig.  Simultaneously,
[Eagle Rock] will (i) commence acquisition of a site for a compressor station
to be located in Section 59, Block M-1, H&GN Survey, Hemphill County, Texas
downstream of the Receipt Point and (ii) initiate the necessary permitting
process for the future installation of compression facilities at such site.

            (b)       High Pressure Deliveries.  Commencing
no later than ten (10) days after the volume delivered at the Receipt Point(s)
equals 3,000 Mcf/d, [Eagle Rock] will proceed to modify its system so as to
provide delivery capacity to [Forest] at the Receipt Point(s) of up to 10,000
Mcf/d at pressures of approximately 450 psig.

            (c)       Reduced Pressure Deliveries.  At
any time after the Effective Date at such time as [Forest’s] daily volume
exceeds 3,000 Mcf/d, [Forest] may notify [Eagle Rock] of [Forest’s] desire that
[Eagle Rock] install compression facilities in order for [Eagle Rock to] accept
deliveries consistent with the volume and pressure provisions of the 3.2.1 and
6.1 hereof.  [Forest] will provide all necessary projections of future
production in order for [Eagle Rock] to maximize the efficiency of its
compression facilities consistent with its contractual obligations.  No less
than four (4) months following the receipt of [Forest’s] notice, [Eagle Rock]
will be prepared to take deliveries of natural gas under this Agreement
pursuant to such provisions.

. . .

            6.1       Delivery Pressures. 
Commencing with the installation of facilities pursuant to 3.4.1(c) hereof,
[Forest] shall deliver Gas to [Eagle Rock] at the Receipt Point(s) at a
pressure sufficient to enter [Eagle Rock’s system against the operating
pressure as it exists from time-to-time, but not to exceed 150 psig.

            In
its findings of fact, the trial court found the delivery, pressure, and
compression provisions central to its determination that processing could not
include compression.  As the court explained:

            The Agreement expressly states that either Peak
(or, subsequently, Forest) may, pursuant to ¶ 3.4.1 and ¶ 6.1, have some
obligation to compress its production.  That is, Peak/Forest had the clear and
express right under the Agreement to compress its production and, under certain
situations, may have had the obligation to do so.  Given that the Agreement
expressly precluded “processing” by Peak/Forest and expressly reserved all
processing rights to [ONEOK]/Eagle Rock (¶ 4.2.1), the Agreement clearly and
unambiguously and as a matter of law provides that the use of
compression—whether in Peak/Forest’s gathering system or [ONEOK]/Eagle Rock’s
gathering system—could not possibly be an act of “processing.”  Thus, Eagle’s
compression could not be processing because Forest’s right and obligation to
compress cannot be processing as a matter of contractual construction.  The
fact that Forest never actually compressed is immaterial to this analysis.  It
had the right under the Agreement to do so.  That is all that matters.

            Because the Agreement precludes “processing” by
Peak, liquids that condensed within Eagle Rock’s gathering system after
compression but prior to the Arrington Plant’s lean oil facilities could not be
NGLs.  They were, therefore, contractual Condensate and this Condensate belongs
exclusively to Eagle Rock.  Therefore, because Forest has no claim to a
“percentage of proceeds” earned from Eagle Rock’s sale of contractual
Condensate, this Court finds no breach of contract as a matter of law from the
contractual interpretation of this unambiguous agreement.  Therefore, for the
reasons stated herein and for the reasons stated in Defendant’s Motion for
Summary Judgment, the Court GRANTS Defendant’s Motion for Summary
Judgment.

            Forest
contends the trial court’s conclusion is erroneous because, in light of the agreement’s
definitions of “Plant(s)” and “NGLs,” processing necessarily includes Eagle
Rock’s removal of NGLs through field compression and the subsequent separation
of liquids and compression within the Arrington Plant.  Specifically, Forest
contends, these definitions reflect that “processing” is the method by which
Eagle Rock mechanically separates NGLs and other products from Forest’s gas.  

            As
noted above, NGLs are defined as “those liquid hydrocarbons recovered from the
Gas from processing” and include “ethane, propane, iso-butane, normal butane,
natural gasolines and incidental methane and other miscellaneous liquids that
become associated with the NGL’s [sic].”  “Plant(s)” are defined as “Gas
processing facilities where Natural Gas Liquids and other Plant Products are separated
from the gas.”  Therefore, Forest asserts, “processing” means “those methods by
which Eagle Rock separates NGLs and other Plant Products from Forest’s gas,” including
the use of mechanical compression which results in the extraction and recovery
of the same types of liquid hydrocarbons which comprise NGLs under the
agreement.  Forest distinguishes the inlet separator of the Mesa Compressor Station,
where gravity and changes in ambient temperatures or pressures caused liquids
to fall out, from the compression process, which “subject[ed] the gas to
mechanically-induced changes in temperatures and pressures.”         In support
of its conclusion, Forest points out that the term “Plant(s)” is not defined by
reference to any specific geographical area, process, or equipment, and it is
not limited to include only the lean-oil facility at the Arrington Plant. 
Forest asserts it is undisputed that compression, both in the field and inside
the lean-oil facility, was integral to the entire operation and, accordingly,
comprises a part of the Arrington Plant.  Thus, under Forest’s construction,
the Mesa Compressor Station and the separators and compressors inside the
fenced-in area, but before the lean-oil facility, fall within the definition of
“Plant(s),” which specifically includes any facilities where processing
occurs.  Forest contends that even the definition of “Condensate” contemplates
that liquids recovered in separators through means other than changes in
ambient temperatures or pressures[11]
would be processed liquids.  

            Forest
also maintains that its construction of “processing” comports with the term’s
plain, ordinary meaning as well as oil and gas industry custom and practice. 
Forest points to Webster’s Dictionary definition of “processing” as “to subject
to a particular method, system or technique of preparation, handling or other
treatment designed to effect a particular result . . . to prepare for market,
manufacture, or other commercial use by subjecting to some process.”  See
Webster’s Third New International
Dictionary (2002).  In light of the plain, ordinary meaning of
processing, Forest contends, “it follows that the methods and techniques used
to get Forest's gas from the wellhead to the tailgate of the Main Plant ready
for market, which specifically include field compression, and to deliver the
gas to the Arrington Plant at sufficient pressure to allow the efficient
separation and extraction of additional liquids [from]·the residue gas stream
to exit the tailgate of the Plant at a sufficient pressure to enter the sales
line, constitute processing of the gas.”  Forest also points out that its
expert, W. Randall Blank, opined that Eagle Rock’s compression of the gas meets
the definition of processing as it is commonly understood in the oil and gas
industry.

            In
response, Eagle Rock contends that Forest’s urged understanding of “processing”
cannot be reconciled with the agreement’s other terms, and the trial court
correctly construed the agreement as a matter of law.  Eagle Rock’s principal
argument in its motion for summary judgment proceeded on a few material facts,
none of which Forest disputed.  These facts included the following:  (1)
Forest’s contractual obligations to Eagle Rock include the obligation to
deliver gas “at pressures sufficient to enter [Eagle Rock’s gathering] system”;
(2) the agreement estimates the line pressure of Eagle Rock’s gathering system
“to range between 95-150 psig”; and (3) Eagle Rock expressly reserves all
rights to process the gas Forest delivered.

            Eagle
Rock then explained that the undefined term “processing” could not include
Eagle Rock’s use of gathering-system compression.  Under the agreement, Forest
was obligated to deliver gas “at pressures sufficient to enter [Eagle Rock’s
gathering] system,”—i.e., at pressures sufficient to overcome Eagle Rock’s
gathering system pressures of 95-150 psig.  The terms Peak negotiated thus
meant that Forest could be required, at some point, to utilize compression
before delivery to Eagle Rock to meet its own delivery obligations.  At the
same time, Forest was contractually precluded from processing any gas delivered
to Eagle Rock, as only Eagle Rock was authorized to engage in “processing.”  Because
Forest is entitled (and potentially obligated) to use compression before
delivery, Eagle Rock argued, its use of compression could not be “processing”
because Forest was contractually precluded from processing the gas prior to
delivery.  

            In
addition to the plain language of the agreement, Eagle Rock also relied on the
testimony of Forest’s Senior Vice President of Marketing, Blaine Wofford, who
was deposed as a corporate representative of Forest.  In his testimony, Wofford
acknowledged that under the agreement Forest may be required to compress its
gas to deliver it to Eagle Rock:

Q.        [Eagle Rock’s counsel]:  Okay.  Let’s look at
Initial Deliveries and Pressures.  That’s 3.4.1(a).  And take a minute to look
at that if you want.

A.        [Wofford]:  Okay.

Q.        It appears to me when reading this, when this
contract was first written, that the seller was permitted to deliver up to
3,000 Mcf a day at the receipt points.  Do you see that?

A.        That’s correct.

A.        And it says, “at pressures sufficient to enter
Buyer’s system.”  Do you see that?

A.        That’s correct.

Q.        If, for example, the pressure for that delivery
was below what was on the buyer’s system, the producer had to increase that
pressure, correct?

A.        If it was below the 95 pounds.

Q.        Yeah.  If the seller’s gas for this 3,000 a day
was not sufficient to enter [the] buyer’s system, the seller had to increase
the pressure, correct?

. . .

A.        Correct.

Q.        And how would a producer do that?

A.        Either the – either the natural flowing pressure
of the wells would allow it to go ahead and enter the system and/or you would
set additional compression behind the central delivery point.[12]

Wofford
thus further confirmed that, under the agreement, Forest could install
compression if necessary to deliver its gas at sufficient pressure to enter
Eagle Rock’s gathering system.  He also confirmed that compression of the gas
in the field constituted processing under Forest’s definition—something Forest
is contractually prohibited from doing.[13] 
This
testimony highlights the internal inconsistency of Forest’s argument.  As
Forest was contractually permitted to compress its gas before delivering it to
Eagle Rock at the CDPs, then the act of compressing the gas could not be
“processing” as Forest broadly defines the term, because Forest is expressly
prohibited from processing its gas before delivery to Eagle Rock.  

            Based
on the summary-judgment record, we conclude that Eagle Rock’s interpretation of
“processing” as applied to the agreement is the only reasonable interpretation,
as Forest’s interpretation is internally inconsistent and contrary to the
parties’ intended use of the word.  Therefore, as a matter of law, Eagle Rock’s
use of compression cannot be contractual “processing.”  

            Forest
contends this conclusion is erroneous, however, because Forest never installed
compression and never contemplated doing so, as it never thought compression
would be necessary given the low delivery pressure specified in the agreement. 
Further, Forest points out that Wofford averred that Forest would abandon the
wells as uneconomical before they reached a flowing pressure less than that
needed to enter Eagle Rock’s pipeline.  Forest also asserts that it did not
expressly reserve the right to install compression because it knew it would
never be necessary given that the agreement placed the obligation to perform
compression on Eagle Rock, not Forest.

            But
as the trial court correctly concluded, the fact that Forest never actually
compressed its gas is immaterial; what is material is that Forest had the right
to do so.  For the same reason, Forest’s argument that the definition of
“Plant(s)” includes facilities where NGLs are “separated” from gas and thus
includes compression facilities is likewise unpersuasive.  To be a “Plant”
under the agreement, such facilities must be “gas processing facilities,” and
gathering-system compressors cannot be “gas processing facilities” as that term
is used in the agreement for the reasons stated.  And, the interpretation of
the agreement does not change due to the fact that Eagle Rock’s multistage
compression results in the heating and cooling of the gas stream.  Because
gathering-system compression is not “processing” as that term is used in the
agreement, those compressors cannot be contractual “Plants.”  Nor can any
liquids that condense after compression but prior to lean oil processing be
liquids that were “saved and sold at the Plant(s).”  

            Our
conclusion is buttressed by a recent Supreme Court of Texas decision, Dynegy
Midstream Services, L.P. v. Apache Corp., 294 S.W.3d 164 (Tex. 2009).  In
that case, Apache (as seller) and Versado (as buyer) were parties to eighteen different
gas-purchase agreements through which Apache sold gas on a percentage of
proceeds basis to Versado.  Id. at 166.  Gas sold by Apache was
delivered into Versado’s gathering systems, at which point title to the gas
passed to Versado. Id. Versado’s gathering systems included “numerous
compressor stations.”  Id. at 172.  While traveling through Versado’s
gathering systems en route to any of Versado’s three processing plants, some
condensate formed and was collected by Versado.  Apache was entitled to receive
payment on the basis of a percentage of proceeds of NGLs “saved and sold” at
the “plants” or “extracted through Plant processing.”  Id. at 173.  Apache
nonetheless claimed that Versado should pay Apache (1) for certain condensate
formed and collected in Versado’s gathering system, and (2) for gas that Apache
characterized as “unaccounted for” gas.  Id. at 167.  The Supreme Court
rejected Apache's condensate claim as to all of the contracts at issue,
explaining:

Some of the contracts in issue do not define “plant,” but
six of them define the term as a facility where gas is processed.  Unlike
plants, the compressor stations do not treat the liquids; the liquids merely
collect at the station.  Plants employ several stages or processes that include
refrigeration or huge compressors to deliberately make liquids.  The compressor
stations are necessary to move gas to a plant, where the gas and liquids can be
treated and sold to third parties.  Compression at the plant is achieved through
multi-stage compression and at higher pressure than compression at the North
and South Eunice stations.  

The contracts cannot be read to require Versado to
compensate Apache for liquids that condense at the two compressor stations.  First,
all the contracts provide that title to the gas transfers to Versado at or near
the Apache wellheads.  Therefore, absent some more specific provision to the
contrary, Versado owns any liquids that condense from the gas stream downstream
of the wellheads, at the compressor stations or anywhere else.  Second, all of
the contracts in issue provide that Versado is only obliged to pay Apache for
liquids “saved and sold” at the “plant” or, in one contract, to pay Apache for
“Products” defined as liquids “extracted through Plant processing.”  As
explained above, the compressor stations are not plants.  Further, gas liquids
were not “saved and sold” at the compressor stations.  Third, ten of the eleven
contracts expressly provide that any liquids exiting the gas stream en route to
the final processing plants belong to Versado .

Id.
at
172–73 (footnote omitted).  Accordingly, the general conclusion of the Dynegy
court is that Apache’s condensate claim was contrary to the governing contract
language, “which focuses on the gas sold, not gas delivered.”  Id. at
165.  With respect to “percentage of proceeds” contracts, the court explained
that such contracts “unambiguously base payment on the amount of gas ultimately
sold at the tailgate (not the amount initially delivered at the wellhead).”  Id.

Forest contends Dynegy is distinguishable
because the terms of the contracts at issue in were materially different from
those of the agreement and the result is not universally applicable to all oil
and gas cases involving disputes between producers and processors.  Specifically,
Forest first points out that in Dynegy, ten of the contracts at issue
provided that Versado owned “all liquids” that dropped out of the gas stream
before the first stage of compression at the plant, see id. at 173 &
n.36, when in contrast, under the agreement Eagle Rock is only entitled to
retain Condensate.  Forest also contends that the Dynegy contracts’ defined
terms “Gas Gathering System” (which is not defined in the agreement in this
case) and “Plant” compel a different result.  Forest further asserts that the
compressor stations in this case go through the same processes that the Dynegy
court ascribes to the plants in that case, through the use of the multistage
compression involving mechanically induced changes in temperatures and
pressures.  See id. at 172–73 (stating that “[u]nlike plants, the
compressor stations do not treat the liquids, the liquids merely collect at the
station” and “[p]lants employ several stages or processes that include
refrigeration or huge compressors to deliberately make liquids”).   

But, as the Dynegy court noted, all of the
contracts at issue—much like the agreement—“provide that Versado is only
obligated to pay Apache for liquids ‘saved and sold’ at the ‘plant’ or, in one
contract, to pay Apache for ‘Products’ defined as liquids ‘extracted through
Plant processing.’”  Id. at 173.  And, as the court explained, “the
compressor stations are not plants.”  Id.  Rather, compressor stations
“are necessary to move gas to a plant, where the gas and liquids can be treated
and sold to third parties.”  Id.  Forest attempts to distinguish this
case from Dynegy by asserting that the multistage compression at issue
here is “integral to the entire process of the Arrington Plant, and not merely
a method of delivery.”[14] 
We decline to read Dynegy so narrowly.  The relevant conclusion the Dynegy
court reached was that, under the various contracts at issue, Versado was required
to pay Apache for liquids produced and sold at the processing plants at the end
of Versado’s gathering system, but was not required to pay Apache for
condensate that fell out of the gas stream at the compressor stations.  Id.

We acknowledge that some of the specific terms of
the Dynegy contracts differ from those in the agreement, but the
ultimate conclusion the Dynegy court reached is consistent with our
interpretation of the agreement, and therefore provides additional support for
the conclusion that Eagle Rock’s understanding of the agreement is the only
reasonable interpretation as a matter of law.  As in Dynegy, the “Plant”
relevant to the agreement is a facility that yields NGLs after processing. 
And, for the reasons already explained, those NGLs that exist after lean-oil
processing at the Arrington Plant are the only NGLs for which Eagle Rock is
obligated to pay Forest under the agreement.  Accordingly, Eagle Rock is not
required to pay Forest for liquid hydrocarbons that fall out of the gas stream
in separators used during compression at the Mesa Compressor Station and the
Arrington Plant before the gas is processed in the lean-oil facility for sale
at the tailgate of the plant.  

We note that the Texas Pipeline Association, as
amicus curiae, has taken a position consistent with our resolution of this
case.[15] 
The association contends that thousands of gas-purchase agreements entered into
by their members rely on the accepted industry definition of “processing” to
mean “the act of extracting liquids at a gas processing plant, not the
incidental condensation of liquids at a compression facility.”  To suggest
otherwise, the association maintains, “is to suggest that an entire pipeline
system is a gas processing facility whose primary function is to extract
liquids from a natural gas stream.”  The association asserts that broadening
the definition of “processing” to include upstream compression “is contrary to
accepted industry practice and would impose significant contractual burdens on [its]
members and other industry participants who are parties to existing gas
purchase agreements.”  Although we appreciate the association’s position that
compression is not synonymous with processing, as we have discussed, our
conclusion is based on the language of the agreement and the summary-judgment
record, as well as the Dynegy opinion.   

Finally, Forest contends that, as a result of the
trial court’s incorrect interpretation of the agreement, it erred by concluding
that Eagle Rock is not liable to Forest for waste.  Forest’s position is that
Eagle Rock breached its duty to perform in good faith by wrongfully commingling
NGLs with condensate and wasting Forest’s NGLs by allowing them to evaporate.  However,
because we have concluded that Forest’s entitlement to payment for residue gas and
NGLs“saved and sold at the Plant(s)” does not extend to the liquid hydrocarbons
that fall out of the gas stream during compression, Forest’s claim for waste
must fail as a matter of law as well.  

*
* *

            We
overrule Forest’s issues and affirm the trial court’s judgment.

 

                                                                                    

                                                                        /s/        Jeffrey
V. Brown

                                                                                    Justice

 

 

 

Panel consists of Justices Anderson,
Brown, and Christopher.









[1]
The reporter’s record also includes five volumes of exhibits.





[2]
Eagle Rock also notes that Forest does not challenge the legal and factual
sufficiency of the evidence.





[3]
Forest alleged that hydrocarbons were also vented into the atmosphere from
these tanks, which was the basis for Forest’s waste claim.  Eagle Rock
apparently transferred the liquids collected to a truck for sale to third
parties.  





[4]
Forest’s expert, Randall Blank, opined that the liquid components recovered
during this process included those that comprise NGLs under the agreement.





[5]
“Gas” or “gas” is defined in the agreement as “natural gas as produced from
Wells in its natural state that meets the quality specifications of Article V”
of the agreement.





[6]
The definition of NGLs also identifies the NGLs' “components” as “ethane,
propane, iso-butane, normal butane, natural gasolines and incidental methane
and other miscellaneous liquids that become associated with the NGL’s [sic].”





[7]
“Receipt Point(s)” means “the inlet flange of [Eagle Rock’s] pipeline
facilities installed to take deliveries of Gas from [Forest].”  





[8]
Condensate from “pipeline drips” is not at issue in this case.





[9]
Specifically, Forest’s compensation for NGLs was based on a percentage of “NGL
Products” determined as follows:

SELLER’s NGL Products shall be determined by
multiplying the total quantity of each NGL Component saved and sold at the
Plant(s) by a fraction, the numerator of which shall be the theoretical gallons
of such Component contained in SELLER’s Gas delivered at the Receipt Point(s)
and the denominator of which shall be the total theoretical gallons of each
Component contained in all Gas delivered to BUYER’s facilities upstream of the
Plant(s).

Net NGL Proceeds shall be [the] sum of each
Component of SELLER’s NGL Products multiplied by the Monthly Average NGL Sales
Price of each Component.

Monthly Average NGL Sales Price shall mean the
average net prices received by BUYER f.o.b. BUYER’s Plant for the sale of each
NGL Component.





[10]
Under the agreement, “Residue Gas” means “the total quantity of MMBTU’s of gas
(both processed and unprocessed) sold at the tailgate of {Eagle Rock’s]
Plant(s).  “MMBTU” means “one million (1,000,000) British Thermal Units.  “MCF”
means “one thousand (1,000) Cubic [Feet] of Gas.” 





[11]
Forest’s expert, W. Randall Blank, averred that “ambient temperature and
pressure” refers to “atmospheric temperature and pressure.”  He further opined
that the inlet separator at the Mesa Compressor Station “uses no mechanical
means to cause a change in temperature or pressure in order to recover any
liquids from the gas stream, but relies on gravity and changes in ambient
pressure and temperature to separate liquids from the gas.”





[12]
At trial, Wofford testified similarly.  He also admitted that Forest’s gas
passes through a separator before delivery to Eagle Rock, and Forest’s recovery
of condensate through the use of that separator would constitute “processing”
under Forest’s definition—something Forest is contractually prohibited from
doing.  





[13]
The agreement also expressly contemplated that Forest could install compression
facilities.  In section 3.1.3, Forest expressly reserved the right “[t]o use
Gas “as fuel in the operation of [Forest’s] compression, dehydration, or
treating facilities, if any installed for the delivery of Gas hereunder.”





                [14]
We note that the
contracting parties fully anticipated that ONEOK would be required to build
compression facilities to accommodate Peak’s increasing volumes of gas (“at
such time as SELLER’s daily volume exceeds 3,000 Mcf/d, SELLER may notify BUYER
of SELLER’s desire that BUYER install compression facilities”) and Forest’s
Blaine Wofford conceded that Eagle Rock’s compression facilities served to
benefit Forest as the producer because the compression lowers the pressure at
which Forest must deliver the gas and saves Forest from having to compress the
gas itself.





[15]
The TPA consists of thirty-nine members who, collectively, engage in the gathering,
processing, and transmission of natural gas and hazardous liquids through
pipelines in Texas.